AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | |
|---|---|
| United States of America<br>v.<br>Deandre Lamar WASH,<br><br>Defendant(s) | )<br>)<br>) Case No. **4-14-70325**<br>) OAKLAND VENUE<br>)<br>) |

FILED
MAR 10 2014
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __February 11, 2014__ in the county of __Alameda__ in the __Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in possession of a firearm and/or ammunition |

PENALTIES:

(1) Imprisonment: Maximum 10 Years.
(2) Fine: $250,000
(3) Supervised release: Maximum 3-year Term
(4) Special assessment: $100.00

This criminal complaint is based on these facts:
See attached Affidavit of ATF Special Agent James A. Talley

APPROVED AS TO FORM:
_____
AUSA James C. Mann

☑ Continued on the attached sheet.

_____
Complainant's signature

James A. Talley, ATF Special Agent
Printed name and title

Sworn to before me and signed in my presence.

Date: 3/10/14

_____
Judge's signature

City and state: Oakland, California

Hon. Donna M. Ryu
Printed name and title



# AFFIDAVIT

I, James A. Talley, being duly sworn upon oath, hereby declare and state:

1. I am a Special Agent (SA) with the United States Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have so been employed since April of 2013. I am presently assigned to the ATF Oakland Field Office in Oakland, California. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7). I was trained as an ATF Special Agent at the Federal Law Enforcement Training Center in Glynco, Georgia.

2. Prior to my employment with the ATF I was a law enforcement officer in the state of Florida (Winter Springs Police Department) for 8 years; the last two of which were as a shift supervisor (Sergeant). During my time as a police officer/SWAT team member in Florida, I participated in physical surveillance operations as well as in the execution of both federal search warrants along with state arrest and search warrants. I have also been involved in numerous cases and investigations to include narcotics and weapons-related offenses.

3. As an ATF Special Agent, I have participated in federal investigations involving the distribution of controlled substances as well as federal firearms violations. During these investigations, I have participated in various types of investigative techniques, including: electronic surveillance; undercover agents and informants; and controlled purchases of firearms and narcotics from suspects. I have participated in physical surveillance operations and have participated in the execution of a federal arrest warrant. In addition to utilizing the aforementioned investigative techniques, I have been required during these investigations to analyze information resulting from traditional record searches, as well as reviewing previous case files.

4. The information in this affidavit, including the opinions which I have formed and statements set forth herein, is based upon my training and experience in the field of firearms and illegal narcotics investigations, personal participation during the course of this investigation, knowledge obtained from investigative reports, reliable sources of information relative to this investigation, consultation with other experienced local and Federal law enforcement officials, and upon my examination and review of various reports and other records. Unless otherwise noted, when I assert that a statement was made, I have either heard the statement directly or listened to a recording of the statement, or the statement was reported to me by another law enforcement officer, either directly or indirectly in a written report. The officer providing me with the information may have received the information by way of personal knowledge or from another source.

5. Because this affidavit is being submitted for the limited purpose of securing a search and arrest warrant, I have not included each and every fact known to me concerning this investigation.

## I. PURPOSE OF AFFIDAVIT

6. This affidavit is made in support of: (1) a complaint charging Deandre Lamar WASH with committing the offense of being a felon in possession of a firearm and/or ammunition, in violation of 18 U.S.C. § 922(g)(1); and, (2) an application for a search warrant for the SUBJECT PREMISES, described below and in Attachment A-1, for evidence of violations of Title 18, United States Code, Section 922(g)(1) (felon in possession of a firearm and/or ammunition), Title 18, United States Code, Section 922(k) (possession of a firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered), and Title 18, United States Code, Section 922(a)(1)(A) (dealing in firearms without a license).

## II. PREMISES TO BE SEARCHED

7. The SUBJECT PREMISES is further described in Attachments A-1.

    a. The residence located at 1001 63rd Street #4, Oakland, California, 94608, which is further described in Attachment A-1 ("SUBJECT PREMISES").

## III. SUMMARY OF INVESTIGATION

8. In or about October of 2013, the ATF initiated an investigation into the North Side Oakland ("NSO") criminal street gang. The NSO street gang consists of various sub-sets and operates predominantly in the area from the 580 freeway in the south to Alcatraz Avenue in the north, and from San Pablo Avenue in the west to Telegraph Avenue in the east. Their criminal activity includes the illegal sale of narcotics, robbery, attempted murder, and murder. The NSO street gang is believed by law enforcement to be responsible for an increase in gun violence in the north Oakland area.

## IV. FACTS ESTABLISHING PROBABLE CAUSE

### A. CI INFORMATION REGARDING WASH

9. On or about January 22, 2014, during debrief an ATF confidential informant (CI) by agents and Task Force Officers (TFO), the CI[1] identified WASH as a source for firearms.

---

[1] The CI is currently cooperating with the ATF for consideration in a pending federal court matter, in which he/she has pleaded guilty to being a felon in possession of a firearm. The CI receive a reduced sentence in exchange for his/her cooperation. Information provided by the CI to ATF has, to date, been found to be credible and much of it has been corroborated. The CI has participated in controlled purchases of firearms and narcotics while wearing audio/video recording devices. The CI has previously been convicted of one felony (Carrying a Loaded Firearm in a Public Place: 2006) and one misdemeanor (Evading Peace Officer: 2006). The CI has previous arrests for various offenses, including but not limited to, 1st Degree Burglary, 2nd Degree Robbery, False Imprisonment, Felon in Possession of a Firearm, Vehicle Theft, Battery: Spouse, Threaten Crime w/ Intent to Terrorize, Possess Marijuana for Sale, Plant/Cultivate Marijuana/Hash, Carry Concealed Weapon in a Vehicle, Driving Under the Influence, Driving While License Suspended, Inflict Corporal Injury Spouse/Cohabitant, Evading Peace Officer, Reckless Driving, Hit and Run, False Information to a Peace Officer,

2

10. On or about the same date, the CI provided information that WASH and two unknown males were driving around north Oakland with multiple firearms looking for family/friends of a rival gang member. It was believed that they were attempting to intimidate this rival who is currently in custody. Oakland Police Department (OPD) officers advised that WASH was on felony probation for firearms and narcotics.

### B.   UC FIREARM PURCHASE ON FEBRUARY 6, 2014

11. On or about February 5, 2014, the CI provided phone number 415-577-9035 for WASH, and advised agents that WASH had a firearm for sale. A commercial database query was conducted for the phone number provided for WASH, which showed WASH's name, social security number, and address (SUBJECT PREMISES) linked to the number.

12. On February 5, 2014, an undercover agent (UC1) placed a recorded phone call to WASH at phone number 415-577-9035. During the phone call, WASH identified himself as "Dre," and instructed UC1 to look up "M1" on the Internet. WASH further advised that he wanted $800 for an M1 firearm.

13. Shortly thereafter, UC1 received a phone call from WASH. During the phone call UC1 and WASH discussed the firearm, which WASH had instructed UC1 to look up, and stated that he "had one before" but "cut the back piece off." This was understood by UC1 to mean that WASH previously had a M1 rifle on which he had cut the shoulder stock off. WASH further advised that the firearm was a "chop." The term "chopper" is a common street vernacular for assault rifles, referring to the sound it makes when fired rapidly resembling a helicopter.

14. On February 6, 2014, UC1 placed a recorded phone call to WASH. During the phone call, UC1 and WASH discussed meeting later to conduct the firearms transaction. Several more recorded phone calls were exchanged between UC1 and WASH to determine where they would meet later that day.

15. On February 6, 2014, an operation was initiated during which UC1 and a second undercover agent (UC2) would meet with WASH and attempt to purchase the M1 rifle. UC1 was outfitted with an audio/video recorder, which captured his interactions during the meeting.

16. Prior to and after arriving at the target location, UC1 had several phone conversations with WASH determining where they were to meet. These conversations were captured on UC1's recorder.

17. UC1 and UC2 arrived at the target location prior to WASH. A short time later, UC1 observed WASH and two males (later identified as Samuel Freeman and Kenneth Ledbetter) arrive in a Toyota Avalon. UC1 confirmed that WASH was "Dre," and WASH unzipped a long gun bag revealing a M1 Carbine rifle with a high capacity magazine.

---

Receive Known Stolen Property, Possession of an Assault Weapon. It should be noted that shortly after the CI's most recent arrest for which he/she hopes to receive consideration, the CI instructed someone to retrieve money that officers may have missed during a search warrant at his/her residence. Also, I believe the CI wrongfully denied the possession of firearms recovered inside his/her residence.

18. UC1 also observed .30 caliber ammunition falling on the floor board where WASH was sitting. UC1 told WASH, "I want all that," and told WASH to wrap the bag in a towel or a blanket. WASH took a white blanket, which was on the ground next to him, and wrapped the rifle case.

19. UC1 retrieved ATF funds from UC2 and exchanged $700 with WASH for the rifle. Freeman handed WASH a set of baseball gloves, which Freeman and WASH indicated was for WASH to grab the ammunition. WASH then grabbed the ammunition and handed it to UC1.

20. Throughout the meeting, UC1 observed a large bulge on Freeman's right side, which he believed may have been a pistol, and a black semi-automatic pistol sitting on Ledbetter's lap.

21. After counting the money, the suspects advised UC1 that he had given them only $700, and UC1 provided WASH with an additional $100. The UCs departed the area shortly thereafter and the operation was terminated.

### C. UC FIREARMS PURCHASE ON FEBRUARY 11, 2014

22. On February 11, 2014, UC1 placed a recorded phone call to WASH. During the phone call, WASH advised UC1 that he had another "M1" and a "little Tec." This was understood by UC1 to mean that WASH had another M1 Carbine rifle and a Tec-9 type pistol. WASH also advised that the M1 was not his, but he would talk to the owner and try to give UC1 a "package deal." WASH further stated that he expected each to be around $700.

23. Later that date, UC1 placed a recorded phone call to WASH in response to a missed call from WASH. During the phone call, WASH stated that he also had a "9 Beretta" and requested $2,100 for all three firearms.

24. Shortly thereafter, UC1 placed another recorded phone call to WASH. During the phone call, UC1 told WASH that he would pay $2,000 for all three firearms. WASH responded "let me call my nigga and see." A short time later, UC1 received a phone call from WASH. During the phone call, WASH agreed to sell all three firearms for $2,000.

25. Based on the information above, a UC operation was initiated during which UC1 and UC2 would meet with WASH in an attempt to purchase firearms on the same date. UC1 was outfitted with audio/video recording equipment, which captured the UC's interactions during the meeting

26. UC1 and UC2 traveled to the same target location and arrived prior to WASH. WASH later arrived by himself driving a rental vehicle. UC1 made contact with WASH and observed a Tec-9 type pistol on his lap. UC1 asked WASH if that was it and WASH handed him the pistol. In addition, WASH also showed him the safety feature on the gun. WASH then placed the gun in a plastic bag and retrieved a Berretta 9mm, and showed it to UC1. WASH placed both of the guns in a white plastic bag and gave them to the UCs.

27. UC1 asked WASH about the other firearm, and WASH indicated it was in the rear seat. UC1 opened the rear driver's side door of WASH's vehicle and saw a long object,

4

which was wrapped in a gray sweatshirt. UC1 unwrapped the sweatshirt to the point he saw the muzzle of a rifle. UC1 handed the rifle to UC2 who then placed it in their car. UC2 then gave WASH $2000 in exchange for the firearms. The UCs and WASH then departed the area and the operation was terminated.

### D.   UC PHONE CONTACT WITH WASH

28.   On or about February 18, 2014, UC1 exchanged recorded phone contact with WASH during which WASH offered to sell UC1 a .45 caliber pistol. This transaction did not occur. Since that time, UC1 has exchanged several text messages and/or recorded phone conversations with WASH concerning the future sales of firearms.

### E.   SUBJECT PREMISES

29.   In or about January of 2014, surveillance units observed WASH enter the SUBJECT PREMISES.

30.   On or about February 27, 2014, surveillance was conducted at the SUBJECT PREMISES. Surveillance units observed WASH exit and enter the SUBJECT PREMISES on two occasions.

31.   A query of the California Department of Motor vehicles was conducted for WASH which showed the SUBJECT PREMISES as his current address on file.

32.   WASH is currently on probation with a registered address of the SUBJECT PREMISES.

### F.   FIREARMS INFORMATION SUMMARY

33.   On or about February 6, 2014, WASH sold a U.S. Military M1 Carbine .30 caliber rifle, bearing serial number AA27054, and sixteen (16) rounds of Lake City .30 caliber ammunition.

34.   On or about February 11, 2014, WASH sold an Inland M1 Carbine .30 caliber rifle, bearing no serial number, an Intratec TEC-DC9 9mm pistol, bearing a serial number which had been obliterated, and a Beretta Model 86 .380 caliber pistol, bearing serial number D06724Y.

35.   A verbal determination was given by a Division Interstate Nexus Expert, which confirmed that the Inland M1 Carbine .30 caliber rifle, bearing no serial number, the Intratec TEC-DC9 9mm pistol, bearing a serial number that had been obliterated, and the Beretta Model 86 .380 caliber pistol, bearing serial number D06724Y were not manufactured in the state of California, thus traveling in and/or affecting interstate commerce.

36.   On or about March 3, 2014, a query was conducted of the National Licensing System which stores information for those licensed by ATF to deal in, manufacture, and import firearms and explosives. No license for WASH was found.

### G. SUSPECT BACKGROUND

37. A review of criminal history records for Deandre Lamar WASH indicated that WASH has felony convictions for the following offenses:

- California Health & Safety Code § 11359 – Possession of marijuana for sale
- California Health & Safety Code § 11350(A) – Possession of a controlled substance
- California Health & Safety Code § 11350(A) – Possession of a controlled substance
- California Penal Code § 29800(A)(1) – Felon in possession of a firearm

### H. TRAINING AND EXPERIENCE CONCERNING THE COMMON PRACTICE OF FIREARMS TRAFFICKERS

38. Based upon my training and experience, and conversations with experienced agents and gang investigators involved in this investigation, I know that:

    a. Persons who sell firearms often store firearms in residences, attached or unattached garages, storage sheds, back houses and other structures to avoid detection by law enforcement. Such persons also keep personal firearms in their residences or vehicles for protection.

    b. Persons who sell firearms keep on hand firearms accessories, such as ammunition, ammunition magazines, silencers, gun cases, magazines and spare parts.

    c. Firearms and firearms accessories are things of value that persons keep for long periods of time. Thus, I believe that such items are still likely to be found at the SUBJECT PREMISES.

    d. Firearms traffickers often maintain records including firearms money ledgers, firearms distribution or customer lists, price lists, firearms supplier lists, correspondence, notation logs, receipts, journals, books, pay and owe sheets, telephone records, telephone bills, address books, bank statements, storage unit receipts, wire transfer receipts, and other documents or devises noting the price, quantity, dates, and/or times when firearms were purchased possessed, transferred, distributed or sold. These traffickers often maintain these records in their home.

    e. Persons who sell firearms often store evidence of their criminal activity on cellular phones or other digital devices. This information may be as simple as customer lists or notes and may be as elaborate as documenting current transactions relating to firearms trafficking.

    f. As described throughout this affidavit, WASH used cellular telephones to facilitate his firearms trafficking activity. Persons who sell firearms use telephones, pagers, radios, and other communication and digital devices to maintain telephone and address books. Telephone bills and other books and papers often reflect identifying information about their criminal associates, co-conspirators, and firearms customers.

      g.    I am aware of persons who sell firearms who take, or cause to be taken, photographs of themselves, their associates, their property, weapons, cash, and drugs; and these traffickers sometimes maintain these photographs in their residences, vehicles, and keep them on their cell phones, or home computers or other digital devices.

## V. **CONCLUSION**

39.    Based on my training and experience, and the foregoing facts, I believe there is probable cause to believe that contraband, evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 922(g)(1) (felon in possession of a firearm and/or ammunition), Title 18, United States Code, Section 922(k) (possession of a firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered), and Title 18, United States Code, Section 922(a)(1)(A) (dealing in firearms without a license), will be found at the SUBJECT PREMISES. I also believe that there is probable cause to believe that Deandre Lamar WASH has violated Title 18, United States Code, Section 922(g)(1) (felon in possession of a firearm and/or ammunition). Any mobile telephones will be searched following the approved procedures provided in the "Attachment C" attached to the search warrant (and attached hereto as "Attachment C" for ease of reference).

_____
James A. Talley, Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives


SUBSCRIBED TO AND SWORN TO ME THIS ___10th___ DAY OF MARCH, 2014

_____
HON. DONNA M. RYU
United States Magistrate Judge

7